**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** )<br>)<br>**Plaintiff,** )<br>)<br>vs. )<br>)<br>**SALVADOR FLORES,** )<br>)<br>**Defendant.** ) | **8:05CR11**<br><br>**REPORT AND<br>RECOMMENDATION** |

An evidentiary hearing was held on June 3, 2005 on defendant's MOTION TO SUPPRESS (#12). The hearing transcript (#21) was filed June 15, 2005, at which time the motion was deemed submitted.

Defendant moves the court for the suppression of all evidence obtained as a result of a traffic stop near Seward, Nebraska on January 9, 2005 because the deputy sheriff (a) improperly expanded the scope of the traffic stop, (b) did not have probable cause to search the vehicle, and (c) did not obtain the defendant's voluntary consent before searching the vehicle.

For the reasons discussed below, I recommend that the motion be denied.

**FACTUAL BACKGROUND**

Deputy Bill Maddux testified that he has had approximately seven years of experience in law enforcement. He is currently employed as a K-9 handler deputy for the Seward County Sheriff's Office. His duties include "K-9 work," drug searches, tracking, serving papers, answering calls, and traffic enforcement.

On January 9, 2005, Maddux was working the 6 a.m. to 4 p.m. shift, in uniform, driving a marked patrol vehicle. Between 10 a.m. and 11 a.m., Maddux was driving east on Interstate 80 in Seward County, west of the Seward exit (mile post 379). Interstate 80 is a divided highway, with eastbound lanes and two westbound lanes. There is a median separating the eastbound and westbound lanes. Although the right-hand lane is designated as the "driving lane" and the left-hand lane the "passing lane," it is legal to drive in either lane. On January 9, there was snow on the ground, but the highway was clear of snow.

Deputy Maddox testified defendant was traveling east in the right-hand driving lane, and there were no vehicles between Maddux and the defendant. He followed defendant for about a mile or a mile and a half and saw defendant's vehicle travel left of the center dotted line, twice, within a short distance. One time, the vehicle went approximately 2 feet into the left-hand passing lane. There were no other vehicles in the passing lane close to the defendant's vehicle, and defendant was not speeding.

After seeing the vehicle swerve twice, Maddux conducted a traffic stop at the 379 exit eastbound to determine if the driver was impaired. He activated his emergency lights but did not turn on his siren. The defendant pulled over without incident. Maddux exited the patrol car and approached the passenger side of defendant's vehicle. Looking through the windows, Maddux saw there were two Christmas-tree air fresheners in the back window deck area of defendant's car. He also saw a Febreze bottle (Febreze is a type of deodorizer) on the rear right floorboard. Maddux testified the presence of air fresheners and the Febreze bottle were

significant because, based on his training and experience, he knew it was common for people involved in transporting narcotics to use a lot of deodorizers to try to eliminate the smell of the narcotics.

Deputy Maddux approached the front passenger door, and defendant rolled down the window. Defendant was alone in the vehicle. At that time, Maddux saw three cellular telephones in the front seat area. One was mounted to the dash, one was in a console cubbyhole and one was plugged into a charger. Maddux believed the presence of three telephones was consistent with an individual transporting large amounts of illegal narcotics or contraband. In his experience, such individuals normally have more than one cellular phone; they have their own phone and the people for whom they are transporting the narcotics often given them a cell phone to stay in contact and make sure everything is okay with the delivery of the narcotics.

Maddux testified that the defendant spoke with a Spanish accent. Maddux, who is not fluent in Spanish, spoke to defendant in English during the entire contact. Defendant also conversed in English and did not ever imply that he did not understand what Maddux was asking him; he responded in such a way that Maddux believed defendant understood him.

Maddux first explained the reason for the stop and asked the defendant for his insurance, registration and driver's license. In response, defendant retrieved the papers from the front seat area. Maddux then had defendant get out of the vehicle and join Maddux back

between his car and the patrol unit, where he asked defendant, either by speech or by gesture, to sit in the front passenger seat of the patrol unit.

Once inside the patrol unit, Maddux reviewed defendant's license, insurance and registration. During this initial conversation, defendant told Maddux the car belonged to him. Defendant also provided a bill of sale showing he had owned the car for about two months. As they sat in the patrol unit, Maddux ran defendant's license number through the communications department. There was a short delay in retrieving the information because communications could not get the information from the license number alone and Maddux had to give them the defendant's name and date of birth. The dispatcher eventually told Maddux everything was fine.

While they were waiting for the results of the records check, Maddux asked defendant where he was headed. Defendant said he had been in Aurora, Colorado for a couple weeks for a family vacation or reunion and was returning home to Cicero, Illinois. When Maddux asked defendant if he was married, defendant said he was. Maddux recalled that defendant said he had at least one child, or possibly two children. Maddux thought it odd that the defendant left his family in Chicago while he went on what Maddux understood to be a family vacation. Also, when Maddux asked defendant where he worked, defendant hesitated and then looked down at the pocket of his jacket, and then showed Maddux the picture or logo on the jacket pocket. Maddux testified he felt that this was a stall tactic; most people

"should be able to rattle right off where they work," but defendant had to think about it for a minute.

After this contact, Maddux did not think defendant was under the influence of drugs or alcohol or that he was otherwise impaired. Maddux issued defendant a written warning for driving left of center, gave defendant a copy of the written warning, and explained it to him. He testified that he returned all of defendant's documents and said, "Thanks," or something to that effect, indicating they were finished with the stop. Defendant got out of the patrol unit, but before he shut the door, Maddux asked defendant if he could talk to him for a few minutes before he took off. Defendant said, "Yeah, sure," (17:25-18:1) and sat back down in the front passenger seat of the patrol unit.

Deputy Maddux asked defendant if he had any weapons or marijuana in the vehicle, and defendant stated he did not. Maddux then asked defendant if he could search his car, and defendant said yes. (18:14-17). Maddux asked defendant to remain in the patrol unit and then conducted a search of defendant's vehicle, where he found several items of significance.

Maddox determined that at least two of the cell phones were working. In the front center console, Maddux found another can of aerosol air freshener. Maddux testified that the odor of air freshener coming from the interior of the vehicle was so strong that it almost made him sick. Maddux opened the trunk, looked under the carpet cover and saw the spare tire. The tire was screwed down, but the tire was flat and was not even beaded onto the rim. The spare tire appeared to be fairly new. The fact that it was flat did not mean anything;

however, it was odd that the spare tire did not have air in it and was not beaded up. He not detect any odor of methamphetamine coming from the tire. Maddux unscrewed the tire and pulled it out. When he lifted it up, the tire seemed abnormally heavy. He set the tire on the ground and rolled it. He could hear and feel objects inside the tire rolling around. Based on his training and experience, he knew there should not be anything inside that tire besides air. Maddux explained that he had previously seized illegal contraband out of tires, and believed this tire contained illegal contraband.

Maddux then returned to the patrol unit, told defendant to get out of the car, arrested him, placed him in handcuffs, and then put him back into the patrol unit. According to Maddux, defendant did not resist and did not say anything. Maddux then went back, cut open the tire, and discovered seven packages of a white "crystally" substance which he believed to be crystal methamphetamine. A field test yielded a positive result for methamphetamine.

Maddux estimated that about 10 minutes elapsed between the time he first approached defendant and the time he asked for consent to search the vehicle.

The entire encounter between Maddux and the defendant was recorded on videotape (Exhibit 1). Maddux manually activated the recording equipment after stopping the defendant's vehicle, and the tape does not show the vehicle swerving across the center line. The tape does show the following events and times:

10:21          Deputy Maddux approaches the Flores vehicle and stands near the front, passenger window. There is no audio on this portion of the tape, save the sound of passing traffic.

10:23          Maddux and Flores move to Maddux's patrol car where conversation occurs. Flores speaks in broken English, but responds to Maddux's questions and all responses are appropriate. Maddux runs the plates on the vehicle by use of his radio and determines there are no warrants on the plates, the vehicle, or Flores.

10:32:25       Flores is given a warning ticket for driving left of center and told by Maddux that he is free to go.

10:33          As Flores begins to exit the patrol vehicle, Maddux asks him if he could talk to him for a few minutes before he leaves. Flores responds, "Yeah, that's fine." Maddux then asks Flores several questions about whether or not he has contraband in the vehicle.

10:33:17       Maddux asks Flores for permission to search the vehicle and Flores responds, granting the permission. Flores' response is clearly and audibly recorded on the videotape and there is no evidence of threat, promise, or inducement by Maddux.

The videotape verifies that the time between Officer Maddux approaching the defendant's vehicle and defendant granting permission to search is approximately 12 minutes.

## LEGAL ANALYSIS

### A. Legality of Traffic Stop

"For purposes of constitutional analysis, a traffic stop is characterized as an investigative detention, rather than a custodial arrest." *United States v. Jones*, 269 F.3d 919, 924 (8th Cir. 2001); *see United States v. Wheat*, 278 F.3d 722, 726 (8th Cir. 2001), *cert. denied*, 537 U.S. 850 (2002). As such, a traffic stop is governed by the principles of *Terry v. Ohio*, 392 U.S. 1 (1968). *Jones*, 269 F.3d at 924. Under *Terry,* 392 U.S. at 21-22, a police officer may conduct an investigative stop if the officer has a reasonable suspicion that the

person stopped is, or is about to be, engaged in criminal activity. *See also Delaware v. Prouse*, 440 U.S. 648, 663 (1979). Reasonable suspicion requires a particularized and objective basis for suspecting the person stopped of criminal activity, but the level of suspicion required for a *Terry* stop is less demanding than that for probable cause. *United States v. Gonzalez*, 220 F.3d 922, 925 (8th Cir. 2000) (internal quotations and citations omitted). "A reasonable suspicion may be justified even if there are innocent explanations for a defendant's behavior when the circumstances are considered in the totality." *United States v. Tuley*, 161 F.3d 513, 515 (8th Cir. 1999). Even "[a] mistaken premise can furnish grounds for a *Terry* stop, if the officers do not know that it is mistaken and are reasonable in acting upon it." *United States v. Ornelas-Ledesma*, 16 F.3d 714, 718 (8th Cir. 1994), *judgment vacated on other grounds*, 517 U.S. 690 (1996) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 184-86 (1990)); *United States v. DeLeon-Reyna*, 930 F.2d 396, 399 (5th Cir. 1991) (en banc) (per curiam); and *United States v. Walraven*, 892 F.2d 972, 974-75 (10th Cir. 1989)).

In this case, Deputy Maddux testified that he stopped the defendant's vehicle to determine if the driver was impaired after observing defendant's vehicle swerve twice, within a short distance, into the passing lane. Although the alleged reason for the stop is not recorded on Exhibit 1, the videotape verifies Maddux's in-court testimony in all other respects and there is nothing in the videotape that contradicts Maddux's testimony concerning the reason for the stop. I therefore find his testimony to be credible as to the reason for the

traffic stop and find that Maddux acted reasonably in stopping the defendant on suspicion of driving while impaired.

### B. Scope and Duration of the Traffic Stop

Having made a valid traffic stop, an officer is allowed to detain the occupants of the vehicle while completing "a number of routine but somewhat time-consuming tasks related to the traffic violation, such as computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning." *United States v. $404,905.00 in United States Currency*, 182 F.3d at 647. "During this process, the officer may ask the motorist routine questions such as his destination, the purpose of the trip, or whether the officer may search the vehicle, and he may act on whatever information is volunteered." *Id. See also United States v. White*, 81 F.3d 775, 778 (8th Cir.), *cert. denied*, 519 U.S. 1011 (1996); *United States v. Ramos*, 42 F.3d 1160, 1163 (8th Cir. 1994), *cert. denied*, 514 U.S. 1134 (1995).

In this case, the record shows that most of these tasks were accomplished in less than 12 minutes, at which time Deputy Maddux returned all of defendant's documents and indicated they were finished with the stop, and defendant exited the patrol car. Not until then did Maddux ask the defendant if he could talk to him for a few more minutes. Defendant said that would be fine, at which time Maddux asked defendant several questions about whether or not he had contraband in the vehicle and asked for permission to search the vehicle.

I find that the defendant was no longer "seized" within the meaning of the Fourth Amendment after Maddux returned defendant's documents, and a reasonable person in defendant's position at the time Maddux asked for further conversation and permission to search would "feel free to terminate the encounter and be on his way." Maddux did not somehow re-seize the defendant by asking if he could talk to him for a few more minutes and obtaining permission to do so. *See United States v. Morgan*, 270 F.3d 625, 630 (8th Cir. 2001), *cert. denied*, 537 U.S. 849 (2002). Nothing in the record suggests that Maddux acted in such a way that a reasonable person would believe that he was not free to decline the request for further conversation or terminate the encounter altogether. *See id.* Thus, I find that the 12-minute traffic stop was not unlawfully expanded, and that the subsequent contact between defendant and Maddux was consensual. *See, e.g., United States v. White*, 81 F.3d at 779 (after defendant's license and registration were returned and the warning was issued, the encounter "became nothing more than a consensual encounter between a private citizen and a law enforcement officer"); *United States v. Sanchez-Garcia*, 313 F.3d 1073, 1078 (8th Cir. 2002) (defendant was no longer seized within the meaning of the Fourth Amendment after officer returned his identification and issued a warning ticket).

In the alternative, should the district court find that the continued contact was not consensual, I find that grounds for reasonable suspicion were generated in the course of the initial contact which were sufficient to justify engaging the defendant in conversation after the traffic stop concluded. An officer who develops a reasonable, articulable suspicion of

-10-

criminal activity may expand the scope of an inquiry beyond the original reason for the stop and detain a vehicle and its occupants for further investigation. *See United States v. Poulack*, 236 F.3d 932, 935-36 (8th Cir.), *cert. denied*, 534 U.S. 864 (2001)). Whether an officer had reasonable suspicion to expand the scope of a stop is determined by examining the totality of the circumstances, in light of the officer's experience. *Id.* In this instance, the presence of numerous cellular telephones, the strength of the odor from deodorizers and air fresheners, defendant's hesitation in identifying his employer, and defendant's "odd" statement that he had been on a family vacation without his family provided a basis for further inquiry beyond the original reason for the stop.

### C. Search of the Vehicle

Police may conduct a search of someone's vehicle, home or person even without a warrant or probable cause if that person voluntarily consents to the search. *See, e.g., United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000); *United States v. Deanda*, 73 F.3d 825 (8th Cir. 1996). To determine whether such a consent was voluntary, the court must examine the totality of the circumstances, including the characteristics of the accused and the nature of the encounter. *See Bradley*, 234 F.3d at 366. The government has the burden of proving consent was voluntary. *United States v. Parris*, 17 F.3d 227, 229 (8th Cir.), *cert. denied*, 511 U.S. 1077 (1994); *United States v. Heath*, 58 F.3d 1271, 1275 (8th Cir.), *cert. denied*, 516 U.S. 892 (1995). "The prosecution need not prove that the individual was fully aware of his or her rights under the Fourth Amendment in order to establish a voluntary consent." *Heath*,

58 F.3d at 1275 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 235 (1973)). "Consent is voluntary 'if it was the product of an essentially free and unconstrained choice by its maker, rather than the product of duress or coercion, express or implied.'" *United States v. Fleck*, ___ F.3d ___, 2005 WL 1522738 at *4 (8th Cir., June 29, 2005) (quoting *United States v. Chaidez*, 906 F.2d 377, 380 (8th Cir. 1990)).

The recorded conversation between Deputy Maddux and the defendant generally corroborates the officer's testimony and shows a verbal consent to search by the defendant. The consent was not limited in any fashion, was not retracted, and was not the result of any threat, promise, or inducement by Maddux.

Considering the *Chaidez* factors[1] in conjunction with the videotape and the hearing testimony, I find that the defendant voluntarily consented to the search of his vehicle.

---

[1] Courts in the Eighth Circuit generally consider the "*Chaidez* factors" to determine if consent was voluntary:

> "Characteristics of persons giving consent" which may be relevant to the question include: (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their *Miranda* rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system.

*Id*. at 381 (internal citations omitted). Characteristics of "the environment in which consent was given" include:

> whether the person who consented (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or a secluded place; or (6) either objected to the search or stood by silently while the search occurred.

*Id*. (internal citations omitted). The factors should not be applied mechanically, *id*., and no single factor is dispositive or controlling. *United States v. Ponce*, 8 F.3d 989, 997 (5th Cir.1993).

*United States v. Bradley*, 234 F.3d at 366.

## RECOMMENDATION

In summary, I find that Deputy Maddux acted reasonably in stopping defendant's vehicle. The traffic stop itself was completed in a reasonable amount of time (less than 12 minutes), and the defendant's subsequent contact with Deputy Maddux was consensual. In the alternative, grounds for reasonable suspicion were generated in the course of the initial contact which were sufficient to justify engaging the defendant in conversation after the traffic stop concluded. Finally, the defendant voluntarily consented to the search of his vehicle.

For these reasons,

**IT IS RECOMMENDED** that defendant's MOTION TO SUPPRESS (#12) be denied.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten (10) days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.

**DATED July 15, 2005.**

        **BY THE COURT:**

        **s/ F.A. Gossett**
        **United States Magistrate Judge**